**Gilbert A. CROSBIE, Plaintiff In Error,**

v.

**The STATE of Oklahoma, Defendant in Error.**

**No. A–12605.**

Criminal Court of Appeals of Oklahoma.

Sept. 3, 1958.

Rehearing Denied Oct. 8, 1958.

Walter C. Henneberry, Tulsa, Okl., for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Fred Hansen, First Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

The plaintiff in error, hereinafter referred to as defendant, was charged by information in the court of common pleas of Tulsa County with the offense of practicing dentistry without a license. A jury was waived and defendant was tried before the court, convicted and punishment assessed at a fine of $500, and to serve a term of thirty days in the Tulsa County jail.

The pertinent portion of the information reads:

"That on the 10th day of August, A. D.1957, and prior to the filing of this information in Tulsa County, State of Oklahoma, Gilbert A. Crosbie in said county, and within the jurisdiction of this court, did unlawfully, wilfully and wrongfully, practice dentistry without first having obtained and received from the Board of Governors of the Registered Dentists of Oklahoma, a license therefor, *in that the said Gilbert A. Crosbie did then and there furnish, supply construct and reproduce a certain lower partial prosthetic denture, known as a lower partial plate, to Lawrence A. Ford, and did take impressions of the lower teeth and jaw of the said Lawrence A. Ford,* contrary

to the form of the statutes in such cases made and provided, and against the peace and dignity of the State." ( Emphasis now supplied.)

For reversal two propositions are advanced: First, that defendant was entrapped; and, second, that the act under which this action was brought, being 59 O.S.1951 § 271, is unconstitutional. These propositions will be considered in the order presented.

The State produced two witnesses to prove the allegations of the information. The defendant did not testify, and offered no evidence.

Lawrence A. Ford testified that he was asked by Tom Harley, attorney for the Dental Association to go over from Oklahoma City to Tulsa and seek an appointment with the defendant to have a partial denture made; that he was taken to Tulsa by Mr. Harley and Mr. Harley gave him $20 to make a down payment on the partial denture plate he was to have made. Witness further said that Mr. Harley drove him out to defendant's place of business. Also that he contacted Mr. Harley through Mr. Demeter, whom he had known for a long time, and that Mr. Demeter was a dental student.

Witness Ford further testified:

"Q. Now, would you please relate to the Court what you did and what conversation was had when you arrived at Mr. Crosbie's place of business? * * * A. Well, when I got there Mr. Crosbie was there and I told him who I was and he said, 'Yes, I was expecting you', and he took me back into a little office, kinda of back of the building there and he had a dental chair there, and I went over and sat down in the chair and we discussed the teeth—I told him I needed a partial for my lower plate here, and—

"Q. Just a minute—Mr. Ford, you told Mr. Crosbie that you needed a lower partial denture plate for your mouth? A. Yes, sir.

"Q. And what was his reply, if you recall? A. You mean when I was talking to him over the 'phone?

"Q. No, when you were in his office. A. Well, he took me in and sat me in this chair and had me open my mouth and he felt my gums with his fingers and we discussed the price which was $100.

"Q. Then what occurred after he felt around in your mouth? A. Well, he told me I had a good base there for the teeth and everything, and he took—he had some stuff there he mixed up and put it in a kind of a spoon thing—I don't know what you call it—kind of like cement, and took an upper impression and then he mixed some more and took the bottom impression. * * *

"Q. And who was the one who was performing this process? A. Mr. Crosbie.

"Q. And then, what was done after the impressions were taken? A. Well, after he taken the impression, I agreed to come back on August 10th, on Saturday, and pick them up, and I told him I didn't have the money to pay him in full then, and so I paid $20 down, and the balance was to be paid when I picked up the teeth.

"Q. When did you pay him the $20.00? A. I paid him the $20.00 just when I left, the first time.

"Q. And what was the total price that you were to pay him? A. $100.-00.

"Q. Then what happened after that, if anything? A. Well, that was it. I paid him $20.00, and he gave me a receipt for the $20.00, but he didn't sign the receipt; just wrote that I paid $20.00. * * *

"Q. Now, after you received this receipt, what did you then do? A. I left then and the next contact, I came back on August 10th,—on Saturday—to pick up the teeth. He told me they would be ready.

"Q. Did you come back by yourself on August 10th, to pick up the teeth? A. No, sir, another fellow by the name of Demeter came with me.

"Q. What did you do when you arrived at Mr. Crosbie's office that day? * * * A. * * * he taken me up into his dental chair—back on the next floor, in his office where he first taken the impression, and he put me up there and tried them in and they didn't fit too good, and so he ground them a little bit—he did that three different times—he had to take them out and grind them. The first time he put them in he got a little black piece of paper that you stick in your mouth and you bite on it, and then he takes them out and grinds them, and after three times doing that, he finally finished with them, and they felt pretty good, and I paid him the balance of $80.00 and left."

Ford admitted that defendant furnished drinks of whiskey to witness and Demeter, and drank with them.

Ted Lewis Demeter, a dental student at Kansas City University, testified that he was present with Mr. Ford when he picked up his dental plate at defendant Crosbie's office on August 10, 1957, his testimony being substantially in accord with that of witness Ford. He said that he put Mr. Ford in contact with Tom Harley, and that the arrangements were made as testified to by Mr. Ford, and that the expenses were to be paid by the Board of Dental Governors.

It was stipulated between the State and the defendant that ninety-eight per cent of all dentures or partial dentures are prepared by dental technicians, and not by licensed dentists.

From the evidence recited it is undisputed that witness Ford was employed by Mr. Tom Harley, who was attorney for the Board of Governors of the Registered Dentists of Oklahoma, for the purpose of contacting defendant with relation to procuring from him the denture referred to in the information, and that Mr. Harley furnished the money to pay for the denture. It is well to note, however, that Mr. Harley was not an officer of any kind, but only a private attorney working for such Board.

Defendant cites and quotes from the case of Shouquette v. State, 25 Okl.Cr. 169, 219 P. 727, as follows:

"Where a private detective, in conjunction with *officers* of the court, acts as a decoy, *and is himself the chief instigator of and performs the major part of the offense,* such scheme will be deemed to be against public policy, constituting a good defense against the conviction of any who were induced to participate, and who would not have participated without such inducements." (Emphasis now supplied.)

Cited also are the cases of Rider v. State, 53 Okl.Cr. 393, 12 P.2d 552, and Wooten v. State, 70 Okl.Cr. 292, 106 P.2d 132.

We reaffirm the principles of law announced in the cases cited, but a careful reading of the facts in such cases will readily disclose factual situations different from the within case. Two recent cases from this court will illustrate the difference. In Ryles v. State, Okl.Cr., 303 P.2d 449, 452, this court, through Judge Brett, said:

"It has been repeatedly held that where the intent to commit a crime originates in the mind of the defendant even though persons acting under the directions of *peace officers* set a trap for the defendant suspected of planning the commission of a crime, if he commits the same, even though encouraged by the officers or persons acting under the direction of *officers* who laid the trap, a conviction can be had on such a basis for that is not entrapment." (Emphasis supplied.)

And this court said in Savage v. State, Okl.Cr.1956, 304 P.2d 344:

" 'Entrapment' is the planning of an offense by an officer, or someone acting under his direction, and his procurement by improper inducement of its commission by one who would not have perpetrated it, except for the trickery of the *officer*." (Emphasis supplied.)

■ The evidence makes it clear that an attorney employed by the Dental Association induced witness Ford to afford the defendant the opportunity to violate the involved statute (59 O.S.1951 § 271). Ford did not have to use persuasion or inducements to obtain an appointment for dental work—the examination of his mouth and gums, and the making of impressions for the partial plate or denture. Defendant had an office with dental chair separate from his laboratory, and it is not disputed that he performed the service for Mr. Ford, and it is apparent was prepared to perform like services for any customer who might appear. The intent to violate the statute in question originated in the mind of the defendant, and under the circumstances of the within case, we find no entrapment.

It is next contended that the statute forming the basis for the within prosecution (59 O.S.1951 § 271), is unconstitutional.

The pertinent portion of the statute in question reads:

"Any person shall be regarded as practicing dentistry within the meaning of this Act who * * * furnishes, supplies, constructs, reproduces or repairs * * * prosthetic dentures (sometimes known as plates), bridges or other substitutes for natural teeth, *to the user or prospective user thereof;* or * * * takes impressions of the teeth and jaws * * *." (Emphasis supplied.)

That a state may enact legislation of the above type for the protection of citizens without violation of constitutional rights is well settled in other jurisdiction. See Semler v. Oregon State Board of Dental Examiners, 294 U.S. 608, 55 S.Ct. 570, 79 L.Ed. 1086.

■ The above proposition was raised in the case of Shewmaker v. State, Okl. Cr., 329 P.2d 858. There the facts were practically identical to the facts in the within case, and the question here raised was there treated in some detail. The case may be referred to. It is our conclusion that every presumption must be indulged in favor of the constitutionality of a statute, and one attacking its constitutionality must make out a clear case of unconstitutionality thereof. Lazar v. State, Okl.Cr., 275 P.2d 1003, appeal dismissed by the Supreme Court of the United States, 349 U.S. 902, 75 S.Ct. 581, 99 L.Ed. 1240.

■ No sound reason has been advanced as to why the statute under consideration is unconstitutional, and no applicable authority is cited, and by reason of what has been said, we hold that 59 O.S.1951 § 271 is not violative of any provision of the Oklahoma Constitution.

■ As to the punishment assessed by the court, it is our thought that the penalty in this case should be no greater than in the companion case of Shewmaker v. State, supra, and, accordingly, the judgment appealed from is modified to a fine of $500 and costs. We think this will serve as a deterrent, the object of punishment. A second charge would not recommend defendant for the liberal consideration that has been accorded.

The judgment, as so modified, is affirmed.

BRETT, P. J., and NIX, J., concur.