Robert M. SHEWMAKER, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–12593.

Criminal Court of Appeals of Oklahoma.

Sept. 3, 1958.

Hickman & Hickman, Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Fred Hansen, First Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

The plaintiff in error, Robert M. Shewmaker, hereinafter referred to as defendant, was charged in the court of common pleas of Tulsa county with the crime of practicing dentistry without a license. A jury was waived and defendant was tried before the court, found guilty and his punishment fixed by the court at a fine of $500 and costs, and imprisonment in the county jail for a period of six months, with jail term suspended upon good behavior and upon payment of fine and costs.[1]

The pertinent portion of the information reads:

"* * * that on the 10th day of August, A.D. 1957, and prior to the filing of this information in Tulsa County, State of Oklahoma, Robert M. Shewmaker in said County, and within the jurisdiction of this court, did unlawfully, wilfully, and wrong- fully, practice dentistry without first having obtained and received from the Board of Governors of the Registered Dentists of Oklahoma, a license therefor, in that the said Robert M. Shewmaker did then and there *furnish, supply, construct and reproduce a certain lower partial prosthetic denture, known as a lower partial plate, to Lawrence A. Ford, and did take impressions of the lower teeth and jaw of the said Lawrence A. Ford,* contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the State." (Emphasis supplied.)

To support the charge the State used two witnesses. The defendant did not testify, and offered no evidence.

Lawrence A. Ford testified that he was employed at Tinker Field, Oklahoma City, and had been for two years; that on August 1, 1957 he telephoned the defendant Shewmaker from a restaurant in Tulsa and

---

1. Of course the order of a court attempting to suspend part of a sentence was a nullity. The court must either suspend the entire sentence, or assess the full punishment. State v. Smith, 83 Okl. Cr. 188, 174 P.2d 932; Ash v. State, 93 Okl.Cr. 125, 225 P.2d 816.

asked him for an appointment for the purpose of having an impression made for a lower partial denture; that defendant inquired as to where witness found out about him, and Ford told him, "I worked out here on some boiler and some of the boys told me about him, and so he told me to come in that evening at 4:30 and have the impression made." Witness testified that Shewmaker asked him the name of the boy who referred him to defendant, and he told the defendant he did not remember the fellow's name; that he called the defendant about 1 o'clock and made the appointment for 4:30. When he reached the defendant's place, at 224 Brookline, Tulsa, defendant was there working on some teeth, and they discussed the price. Witness told the defendant that he did not have too much money.

Witness further testified:

"Well, I went in and told him who I was, and he was expecting me, and he's got a little laboratory there in the back where he does all of his work in, and he set me down there in a chair and he looked in my mouth and felt of my gums, and we agreed on a price of $55.00, so he's got another little room between this little waiting room that's got a dental chair in it and set me down and made the impression and mixed this stuff up in a little tray thing and he takes the upper first, and takes it out after it sets for about a minute and then does the same thing with the lower.

"Q. Does he do this by placing this tray in your mouth? A. Yes, sir, and it stays for approximately a minute, or a little better—until it sets up there.

"Q. Who placed this tray and the substance in your mouth? A. Mr. Shewmaker.

"Q. All right, sir, then what occurred? A. Well, after he did the upper, he did the lower the same way, and then when he got finished, I told him I would pay him $20.00 down, if

that was agreeable to him, and he said it was, and pay the balance of $35.00 when I picked the teeth up.

"Q. Did you pay the $20.00? A. Yes, sir."

Witness was asked about any other conversation, and said:

"Well, we were talking about hunting and fishing, and a few things like that, but he did make the remark that the Dental Association were always sending stooges out there to try to put him out of business, and he said, 'I can spot a stooge a mile off.' "

Witness was supposed to return August 10 for his denture; defendant gave him an unlisted telephone number to call. He testified that he called the number and a lady told him to be there at 2 o'clock; that the wife of witness went with him to pick up the teeth; that defendant was there and had him sit in a dental chair and got the teeth and put them in the mouth of witness; and used some carbon, requiring witness to bite on it, and then defendant took the teeth out and ground on them. He did this three times, and then the teeth felt pretty good in his mouth. Witness identified State's exhibit No. 1 as the lower partial denture furnished him by defendant, and for which he paid defendant a total of $55, $20 down and the balance of $35 when he got the teeth.

On cross examination witness admitted that he had been convicted in the United States Court for the Western District of Oklahoma on a felony charge of forging his father's name to a government check, and received a five year sentence, which was suspended. He said that when he went to Tulsa on August 1 he had already been supplied by a dentist with a partial plate for his lower jaw, and that it worked all right, and that he was not in need of a partial plate. That the only purpose in seeking to have the defendant make a partial plate was on account of being asked by Mr. Tom Harley, attorney for the Dental Association, if he would do this thing, and witness told him that he would. He just

did this in Tulsa. That on his first visit Mr. Harley took the witness to Tulsa from Oklahoma City in Mr. Harley's car; that they first went out to a Mr. Crosbie's laboratory; that this was before they went to defendant; that after visiting Mr. Crosbie's laboratory he and Mr. Harley had lunch and then witness called on the defendant in this case. When he talked to Mr. Shewmaker over the telephone he told him he was in need of a partial plate, but in truth he was not; that he lied to the defendant; that when he talked to the defendant he lied about the man he told him recommended the defendant; that his purpose in lying to the defendant was to get him to make a partial plate (that he did not tell the defendant he already had a partial plate); that the denture he had the defendant make was the same kind of denture he procured from Mr. Crosbie, although the latter was a better one and was more expensive. Defendant said that when he walked out of Shewmaker's office the last time he was wearing the partial plate, but when he got out in the car where his wife, Mr. Harley and a Mr. Demeter were waiting, he took the denture out of his mouth. That the only object he had in calling on Shewmaker and visiting his laboratory was to prevail upon him to make a partial plate without going to a dentist; that he had not been paid for his services but had been told that he would get paid by the organized dentists.

Mildred Lorraine Ford testified that she worked for McKesson & Robbins in Oklahoma City and was the wife of Lawrence A. Ford; that she accompanied her husband to the defendant's place of business on August 10; that she walked into Shewmaker's place with her husband and defendant told her to have a seat and then invited her husband in, and he went in and sat in a dentist's chair, so she moved over to where she could watch, and saw the defendant put his fingers in her husband's mouth and then get a denture and put it in there, and something black for him to bite down on, after which defendant took the paper out, and then the teeth, and then he

walked into a little room and she heard grinding sounds; that defendant came back and put the denture in her husband's mouth again, and then went back in the little room and did some more grinding. That he did this three times, and following this said: "Well, I believe that will be all"; and her husband said, "Well, I guess you want some money." The defendant answered, "Yeah, about $35.00", and Ford paid him $35. That defendant said, "Come see me some time", and she and her husband walked out. That at the time her husband paid the money the partial denture was in his mouth. Witness then identified State's exhibit 1, a partial denture, and said that the first time she saw it was in defendant's dental office, "I guess you would call it a dental office."

On cross examination witness testified that she went in Mr. Harley's car to the defendant's place. She did not know where her husband got the money; that after they had driven about a block away from the defendant's place she saw her husband give Mr. Harley the teeth that he had just purchased.

It was then stipulated and agreed between the parties that if Dr. William E. Cole, secretary of the Oklahoma State Board of Governors of Registered Dentists, were to testify, his testimony would be that he was custodian of the records and of the licenses to practice dentistry in the State of Oklahoma, and that no license had been issued to the defendant. It was also stipulated that Dr. Cole, if present, would testify that in the making and repairing of dentures and partial plates, ninety-five per cent of the dentists in Oklahoma do not do the work themselves, but send such work out to dental technicians and dental laboratories.

For reversal, counsel for the defendant presents two specifications of error. First, it is urged that the statute under which this action was brought, and being 59 O.S. 1951 § 271, is unconstitutional.

We quote the provisions of the statute interposed by counsel, as follows:

"Any person shall be regarded as practicing dentistry within the meaning of this Act who * * * furnishes, supplies, constructs, reproduces or repairs * * * phosthetic dentures (sometimes known as plates), bridges or other substitutes for natural teeth, *to the user or prospective user thereof;* * * * takes impressions of the teeth and jaws, * * *" etc. (Emphasis now supplied.)

It is pointed out by counsel that the above section was enacted by the Legislature in 1935, and amended in 1943 and again in 1955, in which latter year the punishment for practicing dentistry without a license within the meaning of the Act was amended to provide a fine of not less than $100 nor more than $1,000, or by imprisonment in the county jail for not less than thirty days nor more than twelve months, or by both such fine and imprisonment, in the discretion of the court. 59 O.S.A. § 323.

 It is not argued by defendant that the evidence, which has been heretofore summarized, does not reveal that defendant violated the above quoted statutory provisions, but simply that the statute is unconstitutional. Of course we have, in effect, said that every presumption must be in favor of the constitutionality of a statute, and one attacking its constitutionality must make a clear case of unconstitutionality thereof. See Lazar v. State, Okl.Cr., 275 P.2d 1003–1007, and cases cited. And see Williamson v. Lee Optical of Oklahoma, Inc., 348 U.S. 483, 75 S.Ct. 461, 99 L. Ed. 563.

Counsel in support of his position relies on the case of Berry v. Summers, 1955, 76 Idaho 446, 283 P.2d 1093, and says that the Curtis case from this court (Curtis v. State, 78 Okl.Cr. 282, 147 P.2d 465), and Curtis v. Registered Dentists of Oklahoma, 193 Okl. 233, 143 P.2d 427, from our Supreme Court, did not dwell upon the constitutionality of the Act under attack.

We cannot agree that the Berry case supports defendant's contention. In that case Berry had been convicted under an amendment of an Idaho statute, of unlawfully practicing dentistry. The amendment complained of sought to include in the definition of practicing dentistry the construction, correction and repairing of dental prosthetic appliances or dentures.

The court as to the facts said [76 Idaho 446, 283 P.2d 1094]:

"Appellants as such dental mechanics or technicians, in the performance of such services in their dental laboratories, do not, nor do any of their craftsmen, perform any work whatever in the oral cavity of any person, nor do they *touch*, examine, treat or prescribe for, remove denture plates from, or place denture plates in, the mouth of any person, or take dental fittings or impressions of any kind or in any manner whatever *within* the mouth of any customer."

The court held:

"Statutory amendment including in the definition of the practice of dentistry the constructing, correcting, and repairing of dental prosthetic appliances or dentures is unconstitutional because it prohibits a legitimate occupation. I.C. § 54–901; Const. art. 1 §§ 1, 13; U.S.C.A.Const. Amend. 14."

This simply amounted to recognizing that a dental technician does not have to qualify as a dentist; that dental technician is an independent occupation or calling from that of dentist and to require such technicians to have to qualify as dentists would violate their constitutional rights.

The information in the within case, as we have seen, charged that the defendant Shewmaker "did take impressions of the lower teeth and jaw of the said Lawrence A. Ford", and the evidence fully supported the allegation and showed that the impressions so made were used by defendant in constructing and supplying Mr. Ford the "denture, known as a lower partial plate."

While the Oklahoma statutory provision heretofore quoted, 59 O.S.1951 § 271, does not mention dental technicians, it does not

prohibit the calling of dental technician, nor set up standards or requirements, as in the Idaho amendatory statute, that dental technicians qualify as dentists. The only persons required to qualify as dentists are as in the statutes provided:

"* * * [one who] furnishes, supplies, constructs, reproduces or repairs * * * prosthetic dentures (sometimes known as plates), bridges or other substitutes for natural teeth, to the user or prospective user thereof; * * * takes impressions of teeth and jaws, * * *" etc.

There are good reasons why a person may qualify as a competent dental technician but not qualify to make impressions for partial plate or plates. The mouth usually has to be prepared by extracting certain teeth, or filling and smoothing other teeth, if any, or perhaps treating the gums prior to making an impression for a full plate, or even performing surgery. To fail to properly prepare the mouth could result in the serious impairment of the health of the patient (and "patient" is what the prospective user of dentures would be). When to do, and when not to do, certain things and knowledge and know-how are vital for the health and even the life of patients. There is a wide gulf between the competence of a dental technician who works with inert matter in the laboratory and the dentist who is qualified to work in the mouth of the patient and make decisions that require a vastly different background of training from that of dental technician. There are professional educational qualifications to be met in the obtaining of the degree of doctor of dental surgery, and thereafter successfully passing an examination to obtain a license to practice. See 59 O.S.1951 §§ 271, 273 et seq. for details.

We are not called upon to determine the qualifications of the defendant to pursue the calling of dental technician. The dental technician performs a service for licensed dentists, and the dentist would be responsible to the patient for the proper fitting of dentures, and is required to measure up to the standards of his profession or be subjected to suspension of his license.

The statute in question does not prescribe requirements, as in the Berry case. That would force dental technicians out of business. As shown by the evidence the licensed dentist of Oklahoma do not in ninety-five per cent of their cases prepare or repair dentures, themselves. They make the impressions, after the mouth is prepared, and send the impressions out to dental technicians and dental laboratories, where by use of such impressions the dentures are made or repaired for the dentists. We do not attempt to determine whether dental technicians might not repair a broken denture or replace teeth broken from a plate where the technician does not make impressions or work in the oral cavity. Here the defendant did examine Ford's gums and make the impressions.

As argued by the Attorney General, 59 O.S.1951 § 271, supra, though not specifically held constitutional by the Supreme Court of Oklahoma in the case of Curtis v. Registered Dentists of Oklahoma, supra, 1943, 193 Okl. 233, 143 P.2d 427, 429, it did in effect so hold.

In that case Curtis advertised that dental plates were made and sold by him, but the prospective buyer was always sent to a particular licensed dentist to have the impression made for dentures. Defendant did not touch the patient or do any work in the oral cavity. The court said:

"As stated in Protest of Chicago, R. I. & P. R. Co., 137 Okl. 186, 279 P. 319:

" 'It is a cardinal rule that, in the construction of statutes, the legislative intent must govern, and to arrive at the legislative intent, the entire act must be considered, together with all other enactments upon the same subject, and, when the intention of the Legislature can be gathered from the entire statute, words may be modified, altered, or supplied, to give the statute

the force and effect which the Legislature intended.'

"Applying the rule announced in the foregoing case to the statute under consideration we are of the opinion that it is apparent that it was the intention of the legislature to protect the public from any person who might undertake to engage in the practice of dentistry without license to do so, and that part of its purpose was to prevent any one other than licensed dentists supplying artificial substitutes for natural teeth to the persons who would use them. An examination of the stipulation of facts discloses that defendant, who had no license to practice dentistry, was engaged in the business of supplying substitutes for natural teeth to the public at large through advertisements in the newspapers and the telephone directory which patently were designed to induce the public to believe that the defendant was authorized to engage in the practice of dentistry by supplying artificial substitutes for natural teeth. This constituted a direct violation of the provisions of the statute quoted, supra, against a person holding himself out, or employing methods in any way representing himself as being engaged in the practice of dentistry. That the states may enact legislation of this type for the protection of citizens is well settled. See Semler v. Oregon State Board of Dental Examiners, 294 U.S. 608, 55 S.Ct. 570, 79 L.Ed. 1086."

We think our quotation in Curtis v. State, supra, 78 Okl.Cr. 282, 147 P.2d 465, 469, from Semler v. Oregon State Board of Dental Examiners (cited above) an appropriate principle, even though there applied to facts differing from the facts here recited. It was said, concerning the Act of the Legislature:

" ' "The legislature was not dealing with traders in commodities, but with the vital interest of public health, and with a profession treating bodily ills and demanding different standards of conduct from those which are traditional in the competition of the market place. The community is concerned with the maintenance of professional standards which will insure not only competency in individual practitioners, but protection against those who would prey upon a public peculiarly susceptible to imposition through alluring promises of physical relief. And the community is concerned in providing safeguards not only against deception, but against practices which would tend to demoralize the profession by forcing its members into an unseemly rivalry which would enlarge the opportunities of the least scrupulous." ' "

We have been presented no sound reasons as to why the statute complained of should be held unconstitutional, and by reason of what has been said, hold that 59 O.S.1951 § 271 is not violative of any provision of the Oklahoma Constitution.

■ It is next argued that the judgment is void. This argument is based on the fact that the trial court in passing judgment, "fined the defendant $500 and sentenced him to six months imprisonment in the county jail, and immediately suspended the jail sentence upon the defendant paying the $500 fine and costs." Of course the trial court had no authority to suspend part of the sentence. Either all or none of the sentence could be suspended. State v. Smith, 83 Okl.Cr. 188, 174 P.2d 932; Ash v. State, 93 Okl.Cr. 125, 225 P.2d 816.

■■ We could send the case back to the trial court for correction of the judgment entered. However, in this case the defendant apparently had not previously been charged with law violation and the court, while attempting to make certain that the fine would be paid, attempted to suspend the jail sentence on that condition. This he could not do. We think the procedure that we followed in Campbell v. State, Okl.Cr., 287 P.2d 713 should be followed here. That is to say, this court has jurisdiction by provision of 22 O.S.1951

§ 1066 to modify judgments, and in view of the evidence and the effort of the court to modify the judgment rendered, it is the thought of this court that the judgment should be, and it is hereby modified so as to eliminate the jail sentence of six months, as attempted by the trial court; and the judgment is otherwise affirmed, and stands at a fine of $500 and payment of the costs.

BRETT, P. J., and NIX, J., concur.